Good morning, Your Honors. Michael Drake for Oscar Jesus Salais, Petitioner-Appellant case. I'd like to reserve at least three minutes for rebuttal and I'll watch my time. I thought I'd start with the, my computer's not working, so I'll start with the Jackson issue, and just a quick thumbnail of the scenario. There's the initial episode where they encounter, the three eyewitnesses encounter Mr. Salais at the corner, which the prosecutor tells jurors they can use to find Salais guilty of attempting to murder two of the three eyewitnesses, Marco Valladares and Carlos Cisneros. I'll try to keep the names to a minimum. It may be useful later. And then there's the second episode where the three eyewitnesses are sort of scattered, running away down the street, and Salais fires a round of birdshot in some unknown direction, hitting no one, which the prosecutor says to the jury they can use to find guilt on all three counts, based on the kill zone theory. Now I think, I hope I'm on pretty solid ground about why the kill zone theory cannot possibly work on this record. The California Supreme Court has made it clear that it's, you know, it's a discrete theory that's supposed to apply to a distinctively type, a distinctive type of, you know, escalated attack. It's said that what's required is the equivalent of spraying automatic weapon fire into a crowd in order to kill everyone in the crowd, in order to kill a specifically targeted person, and there's just nothing like that in this record. The reason I bring this up is because I wanted to add that, unlike what I suggested in the brief, it's actually clear, the record is actually clear that the jury used the kill zone theory to find guilt on all three counts based on the kill zone theory, and the reason that's clear is that the jury found true discharge allegations that were attached to each count of attempted murder, and the discharge is only relevant on the kill zone theory. Those findings are You know, I'm having trouble. You're mumbling a little bit. Oh, I'm sorry. I'm sorry. Should I rewind? No, no, but try to articulate a little better. Okay, I will try. I have a little bit of a mumbly voice. I'm sorry. Yeah, that's okay. Or slow down a bit. Yeah, okay. That would help. Those findings are Volume 3 of the excerpts at pages 520 to 522. So let me ask you a question about that. So you had this expert who says, well, if it's from three feet, you know, everybody would know that that would be fatal. If it's 100 feet, you wouldn't, but the real distance was somewhere in between. I mean, there was some testimony that it was like 30 feet. I mean, isn't what's important is what's in the mind of the shooter, right? Yes. So what's the basis in the record to say that no reasonable juror could find that somebody shooting a shotgun at 30 feet wouldn't think that was going to be fatal to anybody that was in the range? Well... You've got it bracketed, but the brackets are pretty far apart. It's three feet on the one end, 100 feet on the other end. They're at 30, which is actually closer to the three feet end. Well, the intent... I mean, it's important to figure out what was inside the head of the shooter, but the basis for figuring that out is the actual facts of what happened objectively. There's no evidence of any intent to kill anyone. There's no evidence that he was even Well, I mean, that could be inferred from the fact that one of the victims testified that he pointed the gun at him before he ran, and then they ran and there was a shot. I mean, I would think that particularly on the deferential review, we've got double deference here, a reasonable jury could find that he was pointing it at him. Well, I don't see any support in the case law, in any case law, that's been cited. None of the California cases suggest that the fact that someone pointed a gun during a robbery and then later a gunshot went off is enough, without more to show intent. I've never seen a case remotely like that. Certainly none of the cases... Well, but there is more. I mean, it's not a lot more. While they were still in close proximity, there's this click, which suggests misfire, and then they run and then there's a shot that they hear. One question I have is, assuming they're at 30 feet away, it's pretty clear that one shot is not going to kill all three of them. One shot might kill one of them. Is your argument that this cannot be three counts of guilty, but it could be one? No, it can't be any, not on the discharge theory, because when one, under California law, when one event is alleged to be the cause of three attempts, the intent has to be assessed independently as to each count. And here you have three named counts. So it's not like, I think it's... There's one of the cases where it wasn't a kill zone case, where there was a shot, there was a name, one count, a single count of attempted murder. I think it's Perez. I think it's the Perez case. There was a single count with a named victim. Turns out there was enough to find intent as to someone in the crowd. But that doesn't apply here, because there's three separate counts with one event that's alleged to have been the basis for the intended attempt, for the attempted murder. And under, Canazola says this squarely, you need to analyze in this situation all the evidence of intent as to each named victim. I'm not quite sure I understand the argument. It's possible that... Let me restate, and then you can tell me where I'm... Maybe help me clear up my puzzlement. So let's assume that they're 30 feet away. And as Judge Canelli just said, we don't know. But let's assume for the moment they're roughly 30 feet away. And let's assume that it's possible that at We know that if it had hit one of them, it could have killed. I think we can probably say with some degree of likelihood that it couldn't have killed more than one, because if it was going to kill one, that is to say the shot has to be fairly concentrated. So let's just assume then that the jury reasonably could have concluded that his shot could well have killed somebody and could well have intended to kill the person. So tell me again why that's not a basis to sustain a verdict as to one of them. Because there were three named victims and there's no... And under California law, when we have one shot that's fired that's alleged to... As an attempt to kill multiple victims, the intent needs to be assessed as to each... The evidence of intent, right? Which is when we speak about intent, we're talking about the evidence of it. There has to be some evidence that he was aiming at a particular victim. Well, why can't we assume? Why can't we say that the jury did think that that was so? The jury doesn't know which one it was, but there was a shot. The jury obviously concluded that it was aimed in their direction. Why is there not enough evidence for the jury to assume that it was aimed at one of them? If the prosecution had charged this as a single count of attempted murder and had not named a victim, then there... So you're saying the difference between this case and the one you talked about was shooting into a crowd where there was just one count as if you're charging it as to a particular victim, the intent has to go to that victim, not as to the crowd of people, basically. That's what you're saying. Right. Yeah. And I'd emphasize, there is no evidence that a shot at 30 feet of this round would have been fatal. So I don't think... But there was an attempted shooting at close range. Are you asking me? Yes. There was an attempt... I mean, there was testimony that there was an attempted shooting at close range when they were all there. Right. So there's a separate analysis that applies to that. I mean, if we assume that the evidence was sufficient in that initial encounter to find that there was an attempted murder, then it renders the second theory superfluous because you already have the intent to kill. We don't dispute... That would just be the one person that was being aimed at at that point, right? Right. Well, we have testimony by two witnesses who say each of them that the gun was pointed at him, right? So we say that that's just a physical impossibility, and I can go into that argument if you want, but the argument is that... Whether or not it's a physical impossibility, there was an attempt to shoot the gun at three people from short range. It just didn't go off. No, because we argue that that's not the case. We argue that the testimony that that inference is based off of is the testimony that they saw the gun pointed at their face and that they saw the trigger pull, and they heard a click. Now, we say that the trigger pull would be impossible to see under the conditions they described. If a shotgun is pointed at you, pardon me as I point my invisible shotgun at you, but there's no way the trigger hand is going to be visible. Well, if that's the way you hold it, but go ahead. Yeah, and then there's the secondary testimony about the click. Well, none of these witnesses had any experience with guns, so they had no basis for inferring that the click was... Was there testimony in the record about how close the three guys were standing in the initial encounter, how close to each other? Yeah, there is, and I would pull the sites if I don't understand what's happening here. Forgive me, but yes, they were... Cisneros described him as standing an arm's length away from... They weren't shoulder to shoulder in other words. Well, the two were, and then I think that Cabrera was somewhere further back or further away, nine, ten feet, something like that. You just said that none of them had any experience with guns. That's obviously not true, because one of your arguments is that when Valleres was picked up, he had a short shotgun in his... No, I'm sorry, it was Cisneros who had the shotgun. I apologize. Oh, that's okay. No, no. No, they were each asked, it's very clear, they were each asked whether they had any experience with guns, and all of them said no, and I cite those pages. But we do know that Valleres is a gang member, and to suggest that a gang member has no experience with guns is a... Well, you can make the suggestion. Well, we only have his... Well, in the Jackson claim, we don't have the information that he was a gang member. We have his testimony denying that he has any experience with guns, so that's all the jury had to work on. I was going this way because I did want to say... No, I just wanted to mention that this That's what my question is. So what specifically about the California Court of Appeals decision do you think we should find was unreasonable? On the Jackson claim? On the Jackson. Primarily, I think it's sustaining the verdicts based on the Kilsman theory was just wildly unreasonable, and then I think it's de novo from there. So even if we're considering the other theory of liability, it's still de novo, and I don't think you have to consider whether the state court reasonably assumed that the testimony about the initial encounter was physically possible. At some point, I want to ask you about the Brady claim, but I don't want to... Of course. I'm happy to move on to the Brady claim. So here's my question about that. So acknowledging that there doesn't have to be deliberate suppression, there has to be suppression for there to be a Brady claim. So how did the prosecutors suppress anything here? I think the suppression is based on the Kiles v. Whitley rule that the prosecutor has a duty to learn about evidence. So what you're saying is that not affirmatively going out and getting the police report equals suppression? Yeah. Is there a case that supports that as constituting suppression? I haven't seen a case like this where a prosecutor's information is flagged to a prosecutor and he resolutely refuses to go get information that he's demonstrating. Why couldn't the defense counsel get the arrest report? Why or when? Why couldn't? I mean, the defense counsel was promptly told about the arrest, right? Why couldn't he go? She could easily have... I don't know whether she could have gotten it because it's not clear whether the law enforcement agency would have disclosed it to her in time before the end of trial. This is the last day of trial when this information came to the fore. Well, you could ask for a continuance and serve a forthwith subpoena. I mean, I did that kind of stuff. Right. We argue that her performance was deficient in not getting this information, but I just don't think that doesn't relieve the prosecutor of his Brady obligation. I'm running short on time. I'd like to reserve the rest of the bucket. Do you want to save your time for Ricardo? Yes. All right. So let's hear from Ms. Ahrens, who's on the seat. Good morning, and may it please the Court. I am Deputy Attorney General Kim Ahrens, appearing on behalf of respondents. The California Court of Appeal reasonably denied Petitioner's claims. With regard to the sufficiency claims and the trigger pull issue, the trigger pull issue really is not and wouldn't operate because he immediately then started manipulating the gun to get it to fire. So that shows something happened to alert him that the gun wasn't working. In addition, the live round ejected from the gun while he was doing that, and the firearms expert testified that when Petitioner tried to rechamber a round, that would have caused the initial round to eject from the gun. That initial live round was found on the corner, the southwest corner of the intersection, which is exactly where that initial confrontation took place. So there was ample evidence that he was trying to get the gun to work at that point. While he was trying to rechamber the round, the victims managed to run away, and they ran down the middle of the street. Two of the victims saw him in the middle of the street. In fact, victim Marco Valadares testified that he looked back, and he saw Petitioner running to the middle of the street. It would have been reasonable for the jury to infer that he was running to the middle of the street to get view of them so that he could get a shot at them. If he was going to just fire in the air, he wouldn't have needed to do that. With regard to the kill zone theory, both the California Supreme Court in the Canazales case and the Bland case described that a defendant can have concurrent intent to kill more than one victim. Even if he is aiming at one victim or two victims, if everyone is within a zone of danger and he's firing a shot or multiple shots or an explosive device in that zone of danger, then a jury can infer concurrent intent. Now, intent is different from attempt. So maybe he intended, but if he's only firing one shot, or if he has a misfire as to only one shot, how can that be attempt as to three? His actions can be inferred from his actions. And so it's not whether he's successful, not whether he has a good aim or the weapon misfires. It's his actions. So here we have he tries to shoot at two of them. The gun is jamming. He runs to a better position as they're running away and fires a shot. So what's the attempted murder? Is the attempted murder the initial shot misfire at the two, or is it the later shot as they're running away? Or do we know? The jury didn't specify which one. Well, had the prosecution argued at trial? Did they argue that the initial shot was itself attempted murder, at least as to the two people who said that they were aimed at? Yes. The prosecution argued both theories. Both? Okay. As to the two, and then with regard to all three, the second incident, because they started down the middle of the street and then they veered to the left on the sidewalk. But two of them, Jonathan Cabrera was in front and then he was followed by the other two. And so Jonathan, I believe, was in front of them about five feet, and then the other two estimated they were between 33 and 34 feet away from Petitioner. So the argument would be we've got attempted murder as to two of them because of the close-up aiming and then the click. But there's a third person, of course, and the attempted murder as the third person has to be then the shot when they're running down the street. And the jury has to assume that he's attempting to murder the one person that he didn't aim the gun at when they were close. Is that the argument? They don't have to assume that he's trying to aim at the third person that he didn't get the first time. He can be trying to get any of them. But I don't understand that. I've got attempted murder as the first two when they're close together and the gun goes click. But I need to worry about how does the attempted murder as the third, if he's not aiming at the third, how can that be attempted murder as to the third? If the third is within the zone of danger, then the jury can infer he has concurrent intent. In other words, he will do whatever is necessary. He's willing to kill all three of them to get to the one. It's as if an example used in the Cabrera case is if someone comes along. Let me understand what you mean when you say willing to kill all three of them to get to the one, meaning if they're 30 feet away, one shot is not going to kill all three of them. It's probably not going to kill two of them. So what do you mean when you say kill all three of them to get to the one? The type of weapon used, the ammunition was 350 to 400 pellets that was spread upon being discharged. So the firearms expert testified it would be probably at 100 feet, not enough to be fatal. But at a distance less than 100 feet, it could be enough to be fatal. And because it spread out… Did the expert actually say that second thing you just said, that under 100 feet it could be fatal? I didn't think he went that far. He did not specifically say that. He was asked by a defense counsel at 100 feet, would it be enough, and he said no. So I apologize for that. He didn't go any further with regard to distances. But the standard of review… I assume that basically the contention is that the jury could reasonably infer that if they're 30 feet away and you're firing these 350 pellets with a sawed-off shotgun, that the person would at least believe that he could be killing anybody in that range. Right? That's your theory? Correct. And Petitioner has the burden of proving that no fair-minded jurist, not one, would find the state court's decision to be reasonable here. And under EDCA that's a high burden, and he has not met that burden. With regard to the Brady claims, the prosecutor disclosed the information as soon as he learned of it. Well, he disclosed the arrest. On this record, can we infer that the prosecutor got a copy of the report? The report's dated the day after the incident. So do we know how he knew about it? Do we know that he ever got that, or can we infer that he got the actual report? He said he received a call, and so he learned about it through a phone call, and he said, this is all I know. And he knew about that Mr. Valadares was arrested. He said that he had gotten drunk and he was brandishing a knife and had made some threats on the bus. He had to kill the bus driver, and he punched someone else and pulled a knife on him, so it's pretty violent conduct. Yeah, and that's a lot of information to have been transmitted just in a phone call. Yes, yes. Which leads me to suspect, at least, that he might have seen the report. He might have got a phone call and seen the report. The record doesn't indicate one way or the other. I would assume if he had the report at that time, he would have given it. Well, if he had the report, he should have. Whether he would have is a different question. So your opposing counsel basically says that, I asked him a question about suppression,  because it's reasonable to infer that the prosecutor would have had access to it. He got a call from the police department. If he had said, give me the report, presumably they would have given it to him. So is there any law, one way or the other, about whether not going out to get something from the police department constitutes suppression, quote-unquote, under Brady and Kiles? Certainly he has a duty to gather information, certainly from law enforcement. He said, this is all I know. This happened within a matter of a very short period of time. The arrest occurred on a Saturday. He brought it to the court and defense counsel's attention the following Monday, as soon as he could. Because he said, this is all I know, that's what the record bears. We've got a lot of case law that tells us that willful blindness on the part of the prosecutor, when some part of the government has the evidence, that's a Brady violation. That is to say, there's an obligation to get that information. You can't sort of segment it off and say, some other part of the government has the information, I didn't have it, and therefore the government is not guilty of Brady. This one kind of sounds like that. Even if he didn't have it, he can't defend himself under Brady in the sense of obligation to disclose on the ground that, well, some other part of the government had it. The record does show that the court said the court didn't have enough information. He said, let's find out. Let's see what we can find out. There was some proceeding that was to take place that day, probably an arraignment, but I wouldn't swear to that. But there was some proceeding, and he said, let's contact the court and see what we can find out. The trial court wasn't more specific than that as to who was to find out. Well, I'm sympathetic to the trial court at that point because all we have is an oral report from the prosecutor as to what was told him in a telephone call. But I think the prosecutor had an obligation to find out that information because it wasn't just something coming in from somebody on the street. It was coming in from an official governmental source. It was coming in from the police. Now, there's a different question as to prejudice. I mean, you've got two Brady ingredients. One is should he have handed it over, and I think he had an obligation to find it. I will assume for the moment that he didn't have it, but I think he had an obligation to get it. But then the question is, okay, what's the prejudice? Would you respond to the prejudice part of the Brady analysis? Yes, absolutely. The trial court, the California Court of Appeal was also reasonable in asserting that there was no prejudice because the evidence that was not disclosed was the potential gang evidence that Valadares might have been in a gang. He had a tattoo that stood for San Gabriel Valley, and there was a witness on the bus who said he made a gang slur, although the witness wasn't more specific than that. Yeah, but the witness testified that he was not part of a gang, and this evidence in the police report strongly suggests that he was. Well, the gang expert in testifying that he didn't think any of the victims were a member of a gang was actually explaining the process of when the petitioner approached them and said, where are you from? And they said, we're not from anywhere, we're from nowhere. And he said, that's traditionally an indication that you're not accepting the confrontation from a gang member. But that's a different question. The question is, was he a gang member, and was there evidence that he was a gang member? He testified that he's not. The police report gives us evidence that suggests that he is. Well, Mr. Balazares did not testify. None of the victims were asked if they were in a gang, so it would not have been impeaching to that. Would have impeached the police officer, though, who testified that way, right? But the court found that that wouldn't have altered the outcome of the case. Now you're getting somewhere, right? Just assume that that comes in, then what? Well, the elements of the crime, the fact that one of the victims was in a gang, might have only shown that it was more of a gang confrontation than originally believed, that the petitioner had a motive to confront the victim. So it would have added more strength to the prosecution's case, and it could have cut both ways with regard to the gang evidence. In addition, the victim, I believe it was Cabrera who said, or actually it was Carlos Cisneros who said, we're not from anywhere when petitioner approached them. It wouldn't have impeached that statement because that statement was made to petitioner. It wasn't testimony. It wasn't necessarily offered for truth. It was just they were at gunpoint, and most reasonable people would say we're not from anywhere under those circumstances. So it was reasonable for the state court to find that there was no Brady violation. And the state court also rejected petitioner's ineffective assistance of claim based on the prejudicial analysis. And there was ample evidence, you know, other evidence. The case didn't rise and fall on Valadares' testimony. There were two other victims. They testified consistently, and then there was also the physical evidence tying petitioner to the crime. There was the shotgun shell casing that matched the gun that was found in petitioner's possession. The victims described the shotgun as a sawed-off shotgun, and that's exactly the type of weapon that was found that petitioner was in possession of. And unless the court has any further questions, I would submit and request that judgment be affirmed. I have one question. Was his counsel, was Elise's counsel, did he perform deficiently, or she? I don't know what it was. By failing to ask for a continuance or follow-up on getting the arrest report? Given what she knew at the time and the timing of the disclosure, it's our position that she did not because this was the last day of trial. They had closing arguments that day, and the jury began deliberation. So certainly she could have requested a continuance, but that would have disrupted the proceedings while they waited for the arrest report. And if she felt she had a fairly strong defense, then it would have been reasonable for her to choose not to disrupt deliberation. All right. Thank you, counsel. Thank you. Mr. Drake? Thank you, Your Honor. On that last question, she couldn't have made a reasonable decision about what to do about the evidence until she got the evidence. So she had a duty to make reasonable investigations. If she doesn't know what this is, she knew, she says it right there on the record, that this is impeachment material against a witness, right? I'm assuming it's deficient performance. I think the question is whether it was prejudicial. Right. So that's the hot topic. Right. So I just think there are two things to keep in mind. One is the record ex ante and the prosecutor's framing. It's all about the prosecutor's framing. You have a prosecutor who is framing this case as a gang member who he's inviting the jury to make improper inferences based on his gang membership in his opening statement, implicitly, explicitly in his argument. When he gets this information, he knows that he's going to have an expert go on the stand and opine that none of the three is a gang member. And then finally, the jurors already had independent reasons to be suspect, suspicious, or skeptical about these witnesses' testimony. They'd all exaggerated or falsified. There was evidence that they had exaggerated or falsified their stories or changed their stories over time in ways that favored the prosecution. This evidence would have neutralized all of those factors and might have neutralized the unfair inferences that might have been drawn because of the prosecutor's invitation and might have made the jury warier of the prosecutor's whole approach and of these witnesses' testimony. Just really quick on kill zone theory. The kill zone theory is just incoherent as to Cabrera, particularly. Cabrera was out front. I cite a case. I think it's Sanchez. My computer's dead, but I think it's Sanchez. It's in the brief. Cabrera is ahead. He could not possibly, and there was no evidence of intent. It was stipulated that there was no evidence of intent as to Cabrera ever. Is there a case that this kill zone theory comes from? A bland is, I think, the originating case when the Californian, and it's cited and discussed in Canizales, which is the main case I cite in our brief. I see I'm out of time. I just ask that the court reverse and remand with instructions to grant the writ. All right. Thank you very much, counsel. Bill Salates v. Pfeiffer is submitted. We will take up Martinez-Pineda v. United States.
judges: WARDLAW, FLETCHER, Kennelly